## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DEBORAH A. TRUDEL,** *et al.*,

     **Plaintiffs,**

         **v.**

**SUNTRUST BANK,** *et al.*,

     **Defendants.**

Civil Action No. 15-1966 (JEB)

## <u>MEMORANDUM OPINION</u>

Reading like the plot of one of John le Carré's Cold War novels, the Complaint in this case opens with the assassinations of Yevgenyi Scherban, a Ukrainian politician and businessman, and Nadejda Nikitina, his wife. In 1996, both were gunned down on the tarmac of an airport in Donetsk, Ukraine, by contract killers dressed as police officers and a flight technician. Although those gunmen were prosecuted, Scherban's three sons were left to hunt globally for their father's overseas cash reserves. Some assets had been stashed in the United States with Defendant SunTrust Bank, but to the sons' chagrin, those accounts are now closed, emptied, or still unidentified. The children and the estates' personal representative hope that this lawsuit against SunTrust and others, brought almost two decades later, will help them reclaim some of those long-lost fortunes.

SunTrust now moves to dismiss the counts against it, positing that too much time has passed for such a suit and that the claims as pled are implausible. As the Second Amended Complaint is, in large part, a historical tale, the Court will grant the lion's share of Defendant's Motion.

I.      **Background**

In narrating this decades-old Scherban family saga, the Court primarily draws from the facts in the Second Amended Complaint (which the Court will, for brevity, refer to as the Complaint) and supplements with other submissions that Plaintiffs provide.  See ECF No. 43. The events recounted there can at times seem fantastical.  The Court, however, suspends any disbelief, reminding itself of Mark Twain's adage: "Fiction is obliged to stick to possibilities; Truth isn't."

A.  Scherban Family History

Scherban, the family patriarch, was born in Ukraine following the end of the Second World War.  Id., ¶ 16.  In apparent filial symmetry, he had three wives and also three sons.  From his first marriage, he gained his eldest son, Evgenyi Scherban (Evgenyi).  Id., ¶ 2.  One marriage later, a second son was born, Ruslan Scherban (Ruslan).  Id., ¶ 3.  Finally, Scherban's third marriage, to Nikitina, completed the trifecta when it produced Yevgen Scherban (Yevgen).  Id., ¶ 4.  Those three half-brothers — Evgenyi, Ruslan, and Yevgen — were the original Plaintiffs in this action.

Scherban amassed more than potential heirs.  In the early 1990s, he made his bed in Ukraine's emerging free-market economy.  Id., ¶¶ 15-16.  Harnessing his capitalist instinct, he started up several notable business enterprises and eventually came to control a network of gas stations throughout the newly independent country.  Id., ¶ 16.  As the Complaint tells it, "[T]he assets under Scherban's control surpassed $100 million," making him one of the richest businessmen in the former Soviet republic.  Id., ¶ 18.

Scherban gained fame not only for his financial success but also for his political rise. When Ukraine hosted its first legislative elections as an independent country in March 1994,

voters elected him to be a legislator to the Rada, Ukraine's national parliament.  Id., ¶ 17.  These feats did not go unnoticed.  As a prominent public figure and businessman, he often found himself the target of criminal enterprises who eyed his businesses and his wealth.  Id., ¶ 19.  Eventually, in 1996, a criminal gang was contracted to assassinate Scherban as a way to eliminate competition in Ukraine's natural-gas industry.  Id., ¶¶ 24, 26.  It was promised roughly three million dollars to carry out the plot.  Id., ¶ 24.

The murderous scheme came to fruition on November 3, 1996.  Id., ¶ 20.  That day, Scherban, Nikitina, and Ruslan (the second son) flew in by private plane to an airport in Donetsk, Ukraine.  Id., ¶ 22.  Three men met them on the tarmac — two posing as police officers with firearms and a third dressed as a flight technician.  Id.  Once the Scherban family disembarked, the conspirators sprayed them with bullets, killing Scherban and Nikitina, as well as two others in their entourage.  Id., ¶¶ 22-23.  Ruslan, then only nineteen years old, survived the incident.  Id., ¶¶ 3, 22-23.

B.  Matters of Inheritance

For a family of serious political and business stature, Scherban and Nikitina surprisingly left no written will or otherwise catalogued their assets.  Id., ¶ 27.  Their estates, surely complex, were instead broken up in accordance with Ukrainian intestacy laws.  Id., ¶¶ 27-30.

To exacerbate inheritance matters, Scherban also deposited significant sums of money in the United States, fearing that Ukrainian banks were unreliable.  Id., ¶ 32.  More specifically, he opened at least three accounts with Defendant SunTrust Bank at its Boca Raton, Florida, branch and others with Merrill Lynch, which is a defendant in a separate lawsuit brought on behalf of his estate.  Id., ¶¶ 35-76; Opp. at 10; see Estate of Yevgenyi A. Scherban v. Merrill Lynch, No. 14-6312 (S.D.N.Y.).

For the most part, Scherban managed these American accounts with the help of his assistant, Alexei Alexeenko.  One account was set up under the names of Nikitina and Alexeenko jointly.  See SAC, ¶ 35.  Although the latter was named on the account, he, in reality, acted only to facilitate Scherban's financial transactions in the United States.  Id., ¶ 36.  A second account was set up, likely in the names of Scherban and Alexeenko, and held unknown sums of money.  Id., ¶¶ 66-67.

The third SunTrust account is the primary focus here.  Scherban opened up this savings account (with terminal digits 5216) around 1994, id., ¶ 38, but it is somewhat unclear who owned Account 5216, both before and after the assassinations.  According to Plaintiffs, "Scherban set up, among other accounts, [this] savings account at SunTrust, designating two direct beneficiaries and the names on the account, namely Nikitina and Ruslan."  Id.  This could mean either that Scherban held the account (which would pass to the beneficiaries, Nikitina and Ruslan, if he died) or that Nikitina and Ruslan held it.  See ECF No. 46-5, Exh. A (June 1997 Statement for Account 5216) (listing Nikitina and Ruslan as addressees); see also SAC, ¶ 3.  To whom the funds would pass should Nikitina die is also unclear — either half to Nikitina's estate and half to Ruslan or entirely to Ruslan — as the individuals' ownership rights in the accounts are not specified.

These details matter not in the end, and so the Court will not fuss over them now.  It will assume, to Plaintiffs' benefit, that both estates and Ruslan held some legal share of the third account.  Prior to Scherban and Nikitina's deaths, that account contained over one million dollars.  See SAC, ¶ 41.  Regardless of Ruslan's ownership status, he alleges that he "was unaware of the existence of Account x5216" and "has no recollection that anyone told him about that account" when it was opened.  Id., ¶¶ 38-39.  He lacked this knowledge because — in a

fateful pattern for all of Scherban's holdings — Alexeenko was tasked with keeping tabs on the family's American financial interests.  Id., ¶¶ 37, 68-69, 82-86; see ECF No. 46-13 (Affidavit of Mikhail Serdiouk), ¶¶ 5-9 (alleging Alexeenko lived at address where Account 5216's statements were sent).

    C.  Emptying the Coffers

This shaky financial arrangement was stress-tested when Scherban and Nikitina died in November 1996 — a test it flunked.

On December 17, 1996, SunTrust received a fax signed "N. Nikitina" requesting that the bank transfer via wire $282,000 from Account 5216 to a Czech Republic bank account held by a corporation, Defendant Gwynfe Holding Limited.  See SAC, ¶¶ 45-46.  Among other suspicious circumstances (e.g., Nikitina was deceased), the fax misspelled the name of the Czech bank and did not use SunTrust's wire-transfer form.  Id., ¶¶ 52-53.  Yet SunTrust employees approved the transfer anyway.  Id., ¶¶ 48-51, 55-56.  The family discovered in 2014 or 2015 that Gwynfe was incorporated in the British Virgin Islands until its dissolution sometime after 1999.  Id., ¶¶ 57-58. (It has not yet been served in this suit.)

The remainder of the account — which amounted to $771,129.03 as of June 1997 — was kept intact.  Id., ¶¶ 62-65.  That account was closed following inactivity on January 22, 2003, however, and SunTrust allegedly then held onto the extant sums.  Id., ¶¶ 62-65, 97 (stating that SunTrust never transferred the money to State of Florida after five years, as required by statute). In other words, in one way or another, all of Account 5216's funds are gone.

Separately, within two days of the murders, Alexeenko and an associate of his opened a SunTrust checking account in the name of a company that they jointly owned.  Id., ¶¶ 70-71.

Without the family's authorization, Alexeenko then transferred into that SunTrust account over two million dollars from one of Scherban's other corporate accounts.  Id., ¶¶ 72-73.

D.  Later Discoveries

While the Complaint now recounts these misdeeds, Plaintiffs were not aware of them for some time.  After Scherban and Nikitina's assassinations, the sons feared that they would also be targeted — indeed, on one occasion, an assailant shot at Evgenyi as he was traveling in a car, resulting in another passenger's death.  Id., ¶ 80.

Scherban's former associates also undermined the family.  Alexeenko stole from Scherban's businesses and, between 1996 and 1997, withheld from the sons letters sent by an American attorney.  Id., ¶¶ 72-73, 81.  These missives would have allowed two of them to seek refuge in the United States and investigate their father's financial matters.  Id., ¶ 81.  Because they could not emigrate, Evgenyi and Ruslan lived an itinerant life for many years in other parts of Europe.  Id., ¶¶ 39, 44, 81.

Scherban's estate was nevertheless still able to manage a few of its affairs abroad.  In 1999, for instance, it opened a probate matter in Florida to dispose of a family home located in Boca Raton.  Id., ¶ 77.  When the property was eventually sold, the estate deposited the proceeds in a trust account at SunTrust, which was open from March 2001 to April 2003.  Id.

In May 2003, the sons were finally able to reconnect with Alexeenko.  Id., ¶ 82.  They arranged for a family acquaintance to meet with him in Florida, where the erstwhile advisor turned over some financial documents and several expired, unused SunTrust debit cards under Nikitina's and Ruslan's names.  Id., ¶¶ 81-83.  Plaintiffs continue to be unaware of which bank accounts the cards belong to.  Id., ¶¶ 68, 82-83.  In those meetings, Alexeenko also executed a

notarized affidavit where he forswore any stake in Scherban's business fortunes and affirmed that he was but a secretary who managed limited financial matters. Id., ¶ 82.

Alexeenko glaringly omitted a few things. Not only did he not reveal that he had pocketed some two million dollars, but he and other assistants also withheld complete financial information from the sons. Id., ¶¶ 84-85. Ruslan, on this point, suggests that Alexeenko or other assistants failed to forward mail addressed to him from SunTrust. Id., ¶ 42. Some of those SunTrust accounts had listed as the relevant address Scherban's Boca Raton property, not a Ukrainian address. Id., ¶ 34. For instance, through affidavits attached to their Opposition, Plaintiffs inform the Court that SunTrust sent statements for Account 5216 to the Boca Raton home. See June 1997 Statement. Alexeenko would have possessed (and thus should have disclosed) those statements, as he allegedly resided at that address. See Serdiouk Affidavit, ¶ 9.

For the most part, Plaintiffs did not begin uncovering Alexeenko's and others' various wrongdoings until 2014, during discovery in their related New York action filed that August. Id., ¶¶ 37, 40, 45, 47, 117. In May 2016, they finally recovered SunTrust's June 1997 monthly statement for Account 5216, which indicated that a balance of $771,129.03 remained in that account after Gwynfe's unauthorized transfer of $282,000. Id., ¶ 62.

E.   The Present Action

On November 6, 2015, the sons and Scherban's and Nikitina's estates filed the present lawsuit against Defendants SunTrust, Alexeenko, Gwynfe, and Does 1 through 10 (ten unnamed individuals, including Gwynfe employees, who had facilitated the aforementioned frauds). See ECF No. 1. Since then, this lawsuit has involved plenty of clean-up work regarding which Plaintiffs or Defendants are proper.

One month into the lawsuit, Plaintiffs apparently feared that the Court lacked personal jurisdiction over Alexeenko, and so they stipulated to dismissing him without prejudice.  See ECF No. 11 (Notice of Voluntary Dismissal).  Then, following SunTrust's first motion to dismiss, the Court issued an Opinion instructing Plaintiffs also to remove the estates as parties, as estates cannot bring a direct suit, and to designate instead the proper personal representative.  See Estate of Scherban v. SunTrust Bank, No. 15-1966, 2016 WL 777913, at *2 (D.D.C. Feb. 26, 2016).

An Amended Complaint fared little better, as only the sons were named as Plaintiffs, and a personal representative for the estates was again missing from the caption.  See ECF No. 27.  Following full briefing on another motion to dismiss by SunTrust, the sons informed the Court that both estates had finally obtained a representative, Deborah Trudel, through the Probate Division of the Superior Court.  See ECF No. 34-6; see In re Yevgenyi A. Scherban, No. 16-ADM-729 (D.C. Super. Ct. Prob. Div.); In re Nadejda Nikitina, No. 16-ADM-736 (D.C. Super. Ct. Prob. Div.).  In a brief Order, the Court accordingly denied Defendant's motion without prejudice and specifically directed that "Plaintiffs shall file a Second Amended Complaint naming as Plaintiffs only Trudel as personal representative and Ruslan Scherban in his own individual capacity," as the latter was plausibly named as a joint holder of Account 5216.  See ECF No. 41.

The instant Second Amended Complaint nonetheless names Trudel, Evgenyi, Ruslan, and Yevgen as Plaintiffs.  In tow, they bring twelve counts against SunTrust, asserting that the bank assisted the unauthorized wire transfer of $282,000 from Account 5216, kept hold of the remaining $771,129.03 from that account, and later failed to disclose key financial information.

While all counts list SunTrust as Defendant, only some name Gwynfe or Does 1 through 10. True to practice, SunTrust has once again moved to dismiss.  That Motion is now ripe.

## II.    Legal Standard

A party may invoke Federal Rule of Civil Procedure 12(b)(6) to dismiss a complaint that fails "to state a claim upon which relief can be granted."  In evaluating that motion to dismiss, the Court "must treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted); see Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1250 (D.C. Cir. 2005).  The Court need not accept as true, however, "a legal conclusion couched as a factual allegation" or an inference unsupported by the facts set forth in the Complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Rule 12(b)(6)'s pleading standard is "not meant to impose a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), as a complaint should survive so long as there is a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 n.8 (2007) (quoting Dura Pharm., 544 U.S. at 347).  Although "detailed factual allegations" are not necessary to withstand a dismissal motion, id. at 555, a complaint still "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  That is, a plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A complaint may survive even if "'recovery

is very remote and unlikely'" or the veracity of the claims are "doubtful in fact" if the factual matter alleged in the complaint is "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555-56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

**III.   Analysis**

At the heart of Plaintiffs' lawsuit is a basic desire to reclaim assets once belonging to Scherban and Nikitina.  Yet the Complaint presents a twelve-course tasting menu of counts; it is not quickly digestible.

Briefly, the causes of action against SunTrust are as follows: conversion or confiscation (Count I); breach of contract (Count II); negligence (Count III); breach of fiduciary duty (Count IV); fraud (Count V); unjust enrichment (Count VI); money had and received (Count VII); accounting (Count VIII); declaratory relief (Count IX); fraudulent concealment (Count X); civil conspiracy (Count XI); and constructive trust (Count XII).  Plaintiffs support these claims with factual allegations that SunTrust is responsible for approving the $282,000 unauthorized wire transfer, retaining $771,129.03 that belongs to the estates or Ruslan, and more recently failing to disclose financial information relevant to Scherban's many accounts.  Defendant moves to have each count dismissed.

Dismissal is easier said than done.  To borrow from Tolstoy: All happy counts are alike; each unhappy count is unhappy in its own way.  The Court addresses in turn the following issues: (1) a preliminary question regarding the proper Plaintiffs here, (2) another threshold issue concerning what law to apply, either the District of Columbia's or Florida's, (3) whether a number of the claims (Counts I-VII, XII) are timely under several applicable statutes of limitations and repose, (4) whether a private right of action exists for certain federal statutes such

that Plaintiffs could seek declaratory relief (Count IX), and (5) the merits of the accounting, fraudulent-concealment, and civil-conspiracy claims (Counts VIII, X-XI).

To presage the conclusion, the Court ultimately finds that: (1) only Trudel and Ruslan may bring suit, (2) Florida law applies, (3) Counts I through VII and XII are time barred, (4) declaratory relief is unavailable here, and (5) Plaintiffs have only properly pled their accounting and fraudulent-concealment counts.

A.  Proper Plaintiffs

The Court first addresses a point now thrice litigated: who are the proper Plaintiffs here? In its last Order, following the filing of the Amended Complaint, the Court directed that "Plaintiffs shall file a Second Amended Complaint naming as Plaintiffs only Trudel as personal representative and Ruslan Scherban in his own individual capacity."  ECF No. 41.  Yet Evgenyi and Yevgen are still on the roster.  SunTrust thus justifiably maintains that the Complaint should be dismissed as to those two Plaintiffs.  See Mot. at 9-10.  The Court agrees.

Plaintiffs' only retort is that Evgenyi and Yevgen individually hold fraudulent-concealment claims (Count X), a cause of action that was not added until the most recent Complaint.  See Opp. at 4-8.  That count, they believe, cannot be brought by Trudel because SunTrust's particular fraudulent acts occurred only in 2015 or 2016, many years after Scherban and Nikitina passed away.  If Trudel can represent the estates with respect to that count, however, Plaintiffs consent to the removal of Evgenyi and Yevgen as parties.  See ECF No. 46-1 (Conditional Motion).

The Court grants that request, although it first notes that Plaintiffs' reasoning is fundamentally flawed.  Whether or not Trudel can bring such a claim does not affect Evgenyi's and Yevgen's ability to do so.  Plaintiffs cannot point out how those two sons have ever

interacted with or held interests in the accounts involved in this action.  In any event, Trudel is a proper Plaintiff here, as she has been empowered by the Probate Division of the Superior Court to pursue claims that Scherban or Nikitina would have possessed had they been alive.  <u>See</u> <u>Dennis v. Edwards</u>, 831 A.2d 1006, 1008, 1013-15 (D.C. 2003) (allowing, in case where defendants removed funds after decedent's death, "personal representative [to] sue[] in his representative capacity, as a court appointed fiduciary, standing in the shoes of the decedent") (citing D.C. Code § 20-701 *et seq.*).  Surely Scherban and Nikitina, if alive, could have asserted a claim that SunTrust fraudulently hid from <u>them</u> information about <u>their</u> accounts.  The only Plaintiffs needed in this action are thus Trudel (as personal representative to the estates) and Ruslan (who jointly held Account 5216); the other sons are dismissed.

      B.  <u>Choice of Law</u>

Another speed bump obstructs the road here.  Before the Court can plow forward with the substance of Plaintiffs' claims, it must determine what law applies.  Defendant briefs its Motion primarily under D.C. law, but Trudel and Ruslan argue that Florida law applies, as the accounts were set up and managed from the bank's Boca Raton branch.  <u>See</u> Opp. at 10-11.  SunTrust, in its Reply, holds fast to its initial position, but concedes that the Court's application of Florida law would not change the outcome of the merits or timeliness issues.  <u>See</u> Reply at 3-5.

Even if this concession is not a full-throated waiver, there appears to be little reason why D.C. law would be relevant in analyzing Plaintiffs' counts.  This Court, sitting in diversity, follows the choice-of-law rules of the forum jurisdiction — *i.e.*, the District of Columbia.  <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496-97 (1941).  In determining which law to apply, those rules require the Court to consider both the "governmental interests" of the states at issue and which jurisdiction has the "most significant relationship" to the dispute.  <u>Hercules &</u>

Co. v. Shama Restaurant Corp., 566 A.2d 31, 40 (D.C. 1989).  That analysis is not hard here.

With all of the relevant events and interactions occurring out of a SunTrust branch in Florida,

that state appears to be the jurisdiction both with the greatest interest in preventing local-bank

misfeasance and with the most contacts to this dispute.  See Hercules, 566 A.2d at 41-42

(examining which jurisdiction's policies would be advanced and factors for weighing the

relationship to the dispute); see also Adolph Coors Co. v. Truck Ins. Exch., 960 A.2d 617, 620

(D.C. 2008) (similar).  Given also Defendant's suggestion that application of Florida law would

not prejudice it, the Court will apply the law of the Sunshine State in the subsequent sections.

    C.  Timeliness (Counts I-VII, XII)

With the preliminaries out of the way, the Court now moves on to the Complaint's actual

counts.  As expected with a case where a large chunk of the relevant events took place over a

decade before the action was commenced (in November 2015), Defendant contends that

Plaintiffs' claims are brought too late under Florida's statutes of limitations and repose.

    As a preface, the Court notes that a few counts are certainly timely.  Plaintiffs'

fraudulent-concealment and civil-conspiracy claims cite SunTrust actions taking place in late

2015 or 2016.  See SAC, ¶¶ 168, 178.  The four-year limitations period for an action for

accounting also does not begin until a plaintiff has actual knowledge that his money has been

taken, which Plaintiffs claim occurred only in 2014.  See Nayee v. Nayee, 705 So. 2d 961, 963-

65 (Fla. Dist. Ct. App. 1998) (permitting claims where defendant "fails to conclusively

demonstrate actual knowledge").  For now, the Court sets aside those three counts, as well as the

one for federal declaratory relief.

This leaves a healthy bundle, consisting of: conversion or confiscation, breach of

contract, negligence, breach of fiduciary duty, fraud, unjust enrichment, money had and received,

and constructive trust — Counts I through VII and XII, respectively.  These causes of action, moreover, do not cover only one incident.  Each count, instead, addresses both events regarding the $282,000 wire transfer from Account 5216 and facts pertaining to the $771,129.03 remaining in the account after the transfer.  See, e.g., SAC, ¶¶ 113, 117-18, 125-26, 135, 141, 145-46, 150-51, 183.  In other words, each count in effect contains two theories for how SunTrust breached various contractual or common-law duties.

This distinction structures the following discussion.  Because the legal analysis of claims based on the wire transfer runs somewhat differently from that of claims based on SunTrust's possession of the account's remainder, the Court bifurcates its explanation for why Plaintiffs' counts are tardy.

### 1. *Wire Transfer*

Given the current state of technology, the idea that an individual would use a fax machine to initiate a large-scale bank transaction may now seem foreign.  Yet that is how Gwynfe allegedly managed to pocket $282,000 of the Scherban family fortune — by someone's sending a fax, signed in Nikitina's name after the couple's death, to a Czech bank.

Although Plaintiffs treat these wire-transfer claims as arising under Florida common law, that framing is not correct.  Florida has adopted aspects of the Uniform Commercial Code, and common-law claims remain available "[u]nless displaced by the particular provisions of th[at] code."  Fla. Stat. § 671.103.  With regard to wire transfers between banks, Florida has codified Article 4A of the Code, which covers fund transfers.  UCC claims brought under Article 4A are thus "intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article."  Id. § 670.102 cmt.  Only if a situation is not specifically provided for in Article 4A may common-law claims

remain viable.  See Regions Bank v. Provident Bank, Inc., 345 F.3d 1267, 1274-75 (11th Cir. 2003); Anderson v. Branch Banking & Tr. Co., 119 F. Supp. 3d 1328, 1356 (S.D. Fla. 2015); see also Fla. Stat. § 670.102 cmt. ("Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.").

Why does this distinction between the UCC and common law matter?  Florida's statutes of limitations applying to the latter are considerably more generous than the statute of repose for the former.  Compare Fla. Stat. § 95.11, with id. § 670.505.  The Court thus first confirms whether the claims are truly displaced by — i.e., specifically provided for by — the UCC before examining the Code's statute of repose.

### a.   UCC Displacement

Determining whether the UCC covers a particular genus of claim is inherently a somewhat fact-intensive inquiry.  See, e.g., Corfan Banco Asuncion Paraguay v. Ocean Bank, 715 So. 2d 967, 971 (Fla. Dist. Ct. App. 1998) (finding negligence claims in case displaced but declining to reach whether to adopt blanket rule displacing all negligence claims); In re Bancredit Cayman Ltd., 419 B.R. 898, 914-15 (Bankr. S.D. Fla. 2009) (finding contract claims displaced where they regarded only the fund transfer).  Some further detail into the Complaint's allegations are thus necessary.

Trudel and Ruslan complain of the unauthorized wire transfer, but these objections take many forms.  They assert that the faxed request had various "red flags": the instruction misspelled the name of the Czech bank; Gwynfe did not list a corporate address; and the sender did not use SunTrust's proper wire-transfer form.  See SAC, ¶¶ 52-53, 56.  In this situation, Plaintiffs contend that SunTrust employees should have attempted to contact Nikitina or

investigated the faxed instructions with the Czech bank, but they approved the fund transfer without a second thought.  Id., ¶¶ 49-51, 53-55.

Closer inspection of the UCC reveals that Article 4A covers these circumstances in full. With regard to the Czech-bank misspelling, Article 4A addresses the "rights and obligations" of SunTrust and Plaintiffs in cases where the sender of the wire-transfer instructions misidentifies the bank.  See Fla. Stat. § 670.208(2)(b).  As to the absence of Gwynfe's corporate address, other provisions then specify what information of the recipient of the fund transfer must be listed.  Id. § 670.207; see Corfan, 715 So. 2d at 969-71 (holding this provision to be exclusive).  Finally, in relation to the proper wiring form and duties to contact Nikitina or the Czech bank, the UCC again comprehensively regulates security procedures for "[d]etecting error in the transmission or the content of the payment order or communication" and the consequences of erroneous payments under those procedures.  See Fla. Stat. § 670.201(2); see also id. §§ 670.202, 670.205. All told, the wire-transfer claims here fit comfortably within the scope of UCC Article 4A, leaving no room for common-law theories to create additional rights or remedies.  See Corfan, 715 So. 2d at 971 n.5 ("The uniformity and certainty sought by the statute for these transactions could not possibly exist if parties could opt to sue by way of pre-Code remedies where the statute has specifically defined the duties, rights and liabilities of the parties."); see also Bancredit Cayman, 419 B.R. at 914 (finding displacement where "the loss suffered by the Plaintiff occurred only when, and solely because of the Funds Transfer").

This means that the Complaint should have instead brought UCC challenges to the Gwynfe bank transfer.  Offering Plaintiffs a liberal construction, however, the Court will treat their common-law claims regarding the transfer as if they were properly pled under Article 4A.

b.   Statute of Repose

Because claims regarding the unauthorized wire transfer must be brought under the Code, Article 4A's statute of repose applies.  As a brief primer, while statutes of limitations prescribe the period in which to file a lawsuit after a cause of action has accrued, statutes of repose "do so regardless of the time of the accrual of the cause of action."  Bauld v. J. A. Jones Constr. Co., 357 So. 2d 401, 402 (Fla. 1978).  A repose period instead commences from the date a specified act has occurred and places a strict "outer limit beyond which . . . suits may not be instituted."  Kush v. Lloyd, 616 So. 2d 415, 421 (Fla. 1992).  The relevant act in this case, of course, was the wire transfer, and Article 4A provides one year for the customer to notify her bank after any unauthorized fund transfer from her account.  See Fla. Stat. § 670.505; see also Lake Wales Publ'g Co. v. Florida Visitor, Inc., 335 So. 2d 335, 335-36 (Fla. Dist. Ct. App. 1976) ("[T]he U.C.C. limitation period generally prevails over that contained in a general statute of limitations.").  Almost twenty have passed here.

Plaintiffs respond that this particular statute of repose is not as draconian as it first appears.  See Opp. at 16-20.  They are partially correct, as the statute's language indeed provides an out.  The otherwise-short one-year period begins only once another condition is met — specifically, when "the customer received notification reasonably identifying the [payment] order."  Fla. Stat. § 670.505.  As Plaintiffs argue, Scherban and Nikitina were dead, and Ruslan was in hiding, making such notification to the accountholders a tricky proposition.

That may be so, but the repose statute does not require that the customer have actual knowledge of the transfer.  Article 4A's definitional section elaborates that a bank "gives" notice to another "by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it."  Id.,

§ 671.201(26); accord id., § 671.209(4).  Hence, a person "'receives' a notice or notification when . . . [i]t is duly delivered in a form reasonable under the circumstances . . . at [a] location held out by that person as the place for receipt of such communications."  Id., § 671.201(26)(b); accord id., § 671.209(5)(b).

This standard thus focuses on whether the bank acted in accordance with the information it knew, not on whether the customer actually received account materials.  See 3 James J. White, Robert S. Summers & Robert A. Hillman, Uniform Commercial Code § 24:8 (6th ed. 2016) ("Note that the bank need not show actual knowledge; it is enough to show 'notification.'").  Courts have thus found that the one-year repose period can begin if the bank and customer "agreed and intended for [another person] to receive their account statements, statements containing the contested debits," and the bank delivered them.  Anderson, 119 F. Supp. 3d at 1351; see B.B.C.F.D., S.A. v. Bank Julius Baer & Co., 77 A.D.3d 463, 466 (N.Y. App. Div. 2010) (commenting, in analyzing UCC, that a plaintiff may not charge bank for losses arising "from misplaced confidence in [her] agent").

This is what happened here.  In the Complaint, Plaintiffs plead that the family designated Alexeenko to be a "facilitator" who received financial information and managed the family's American interests.  See SAC, ¶¶ 35-37, 82-86; see also ECF No. 46-4 (Affidavit of Ruslan Scherban), ¶ 10 ("Alexeenko was authorized to receive correspondence, open and fax relevant documentation that would have come to my name, because I was physically not in the USA, and someone had to attend to the incoming mails.").  SunTrust account information addressed to Plaintiffs was sent not directly to Ukraine, but instead to the family's Boca Raton address, where Alexeenko allegedly resided.  Id., ¶ 34; see June 1997 Statement; Serdiouk Affidavit, ¶ 9.  Confirming this arrangement, Ruslan alleges that he never anticipated receiving direct mail from

SunTrust regarding Account 5216, as he asked that mail sent to him be "routed to Ukraine" — presumably, via Alexeenko — instead.  <u>See</u> SAC, ¶ 42; <u>see also</u> Ruslan Affidavit, ¶ 10 (alleging Alexeenko was tasked with forwarding his mail).  Indeed, the bulk of the Complaint is premised on the idea that Alexeenko received Scherban-family financial information but then acted as an unfaithful agent in concealing it.  <u>Id.</u>, ¶¶ 35-37, 82-86.

As Plaintiffs have themselves explained to the Court, SunTrust thus <u>did</u> deliver account information to a "location held out by th[e] [customer] as the place for receipt of such communications."  Fla. Stat. § 671.201(26)(b).  The fact that family members did not actually gain access to that information — because Scherban's assistants did not route that mail to them in Ukraine — does not change the legal conclusion that SunTrust provided reasonable notice in compliance with the information it knew.  Plaintiffs' claims regarding the wire transfer are thus barred by the UCC's one-year statute of repose.

### 2.  *Account Remainder*

While it may be too late for Plaintiffs to sue SunTrust over the wire transfer, they also bring claims related to the leftover $771,129.03 in Account 5216.  Plaintiffs' theory is this: SunTrust closed that account in January 2003, apparently following years of inactivity.  <u>See</u> SAC, ¶ 97.  Instead of giving that unclaimed property to the State of Florida, where perhaps the sons could lawfully reclaim it, SunTrust then kept the money for itself.  <u>Id.</u>, ¶ 64.  Plaintiffs thus apply their eight aforementioned common-law counts (Counts I-VII, XII) to these acts: conversion or confiscation, breach of contract, negligence, breach of fiduciary duty, fraud, unjust enrichment, money had and received, and constructive trust.

The Court begins with the statute of limitations for those counts, moves next to the delayed-discovery doctrine, and ends with a discussion of tolling.

a.   Statute of Limitations

Perhaps anticipating a situation like this one where a plaintiff brings a smattering of claims, the Florida code assembles many of its statutes of limitations in the same place.  See Fla. Stat. § 95.11.  For Plaintiffs' counts, the time bar for commencing actions is largely uniform — four years, except that contract suits may be brought within five years.  See id. § 95.11(2)(a) (five years for contract), (3)(a) (four years for negligence), (3)(h) (four years for conversion or confiscation — i.e., "taking, detaining, or injuring personal property"), (3)(j) (four years for fraud); Chau Kieu Nguyen v. JP Morgan Chase Bank, NA, 709 F.3d 1342, 1346 (11th Cir. 2013) (applying § 95.11(3)(p)'s residuary four-year period to money had and received, accounting, and constructive trust); Xavier v. Leviev Boymelgreen Marquis Developers, LLC, 117 So. 3d 773, 775 (Fla. Dist. Ct. App. 2012) (applying § 95.11(3)(p)'s residuary four-year period to unjust enrichment); Anthony v. Perez-Abreu & Martin-Lavielle, P.A., 51 So. 3d 525, 526 (Fla. Dist. Ct. App. 2010) (applying § 95.11(3)(p)'s residuary four-year period to civil conspiracy); Berg v. Wagner, 935 So. 2d 100, 102 (Fla. Dist. Ct. App. 2006) (applying § 95.11(3)(o)'s four-year period for intentional torts to breach of fiduciary duty).

All of these periods arrest Plaintiffs' progress.  The four- or five-year clock to file a lawsuit begins ticking when each cause of action accrues.  See Fla. Stat. § 95.031.  Except for the fraud count, accrual happens "when the last element constituting the cause of action occurs."  Id., § 95.031(1).  Given that Plaintiffs' claims all concern SunTrust's unlawful seizure of their money in January 2003, over twelve years before the suit was filed, all of these limitations periods have long since expired.

As to the accrual exception for fraud claims, the Court discusses it in next addressing more broadly the delayed-discovery doctrine.

b.   Delayed Discovery

Although most limitations periods may have passed, Plaintiffs contend that they did not underline discover the specific facts surrounding Account 5216 until 2014 or later.  This, they believe, should stop the running of the clock for each of their counts.

Before moving to the other counts, the Court begins with fraud, as the rules of the game for this count are slightly different and allow for such a discovery exception.  Florida's legislature, in fact, has explicitly provided for a delayed-discovery rule for fraud.  The limitations period to file a fraud action runs "from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence."  Fla. Stat. § 95.031(2)(a).

Even with this momentary advantage, the fraud count suffers from a fatal flaw.  The discovery exception in such a case is limited by another statute of repose.  "[A]n action for fraud . . . must be begun within 12 years after the date of the commission of the alleged fraud, regardless of the date the fraud was or should have been discovered."  Id. (emphasis added).  Trudel and Ruslan allege that SunTrust closed the account in January 2003, yet the sons did not initiate this lawsuit until November 2015, ten months past the twelve-year repose period.  See SAC, ¶ 97; ECF No. 1.  Given that so much time has passed, the delayed-discovery doctrine is of no help.

Next, Plaintiffs also wish to have this statutory delayed-discovery doctrine extend to their other claims regarding Account 5216.  On this point, Florida law is not so liberal.  That legislature has provided statutory delayed-discovery rules only for claims of fraud, products liability, professional malpractice, medical malpractice, and intentional torts based on abuse.  See Fla. Stat. §§ 95.031(2), 95.11(4)(a), (4)(b), (7).  The state has no catch-all discovery statute.

Nor is this Court empowered to create an extra-statutory extension to the doctrine here. In two recent cases, the Florida Supreme Court addressed whether such a general exception existed as a matter of judicial, as opposed to statutory, construction.  First, in Hearndon v. Graham, 767 So. 2d 1179 (Fla. 2000), it considered the viability of crafting one for a tort based on childhood sexual abuse when the abuse-based statutory exception had only been passed after the plaintiff filed her lawsuit.  Hearndon did allow for a judge-made discovery rule in that case, reasoning that such a carve-out was consistent with the later-passed statute, the child-sexual-abuse exception was now widely accepted in American jurisprudence, and the law should acknowledge the uniquely pernicious effects of childhood molestation on victims' memory.  Id. at 1185-86.

In the wake of Hearndon, Florida District Courts of Appeal divided on the reach of the delayed-discovery rule.  The state's Supreme Court, in Davis v. Monahan, 832 So. 2d 708 (Fla. 2002), resolved that split.  That case concerned an elderly dementia patient's suit against family members who had misappropriated her assets without her knowledge.  Id. at 708-09 (involving counts of, inter alia, breach of fiduciary duty, civil conspiracy, conversion, and unjust enrichment).  As Davis described the split, where one district had "call[ed] the delayed discovery doctrine a common law remedy" applicable generally, another district had "found that it was clear the Legislature did not intend for the doctrine to apply to all causes of action."  Id. at 710-11.  Davis came out in favor of the latter approach and concluded, in no uncertain terms, that acknowledging a general common-law delayed-discovery doctrine "would result in this Court rewriting the statute, and, in fact, obliterating the statute."  Id. at 711 (emphasis added).

To the extent that a judicial exception exists under Florida law, it must then be exceedingly narrow.  Although it may effectively be an exception of one (i.e., only Hearndon),

Davis suggested bare minima a case would need to meet if a court were to extend the doctrine: a "statutory endorsement" of a particular cause of action, a "modern trend" among other courts, and a situation where the lack of discovery was "caused" by the defendant's actions.  Id. at 712. Perhaps realizing that Davis's holding practically sounded the death knell for extra-statutory carve-outs, courts have consistently interpreted the case to "limit[] Hearndon so it applies only to cases of childhood sexual abuse" and uniformly declined to extend the doctrine.  Raie v. Cheminova, Inc., 336 F.3d 1278, 1281 (11th Cir. 2003) (wrongful death); see, e.g., Wachovia Bank N.A. v. Tien, No. 15-11158, 2016 WL 4010165, at *3 (11th Cir. July 27, 2016) (conversion); W.D. v. Archdiocese of Miami, Inc., 197 So. 3d 584, 587-88 (Fla. Dist. Ct. App. 2016) (respondeat superior); Access Ins. Planners, Inc. v. Gee, 175 So. 3d 921, 925 (Fla. Dist. Ct. App. 2015) (contract); Cisko v. Diocese of Steubenville, 123 So. 3d 83, 84-85 (Fla. Dist. Ct. App. 2013) (negligence); Brooks Tropicals, Inc. v. Acosta, 959 So. 2d 288, 296 (Fla. Dist. Ct. App. 2007) (fiduciary duty and contract); Patten v. Winderman, 965 So. 2d 1222, 1224 (Fla. Dist. Ct. App. 2007) (fiduciary duty); Med. Jet, S.A. v. Signature Flight Support-Palm Beach, Inc., 941 So. 2d 576, 578 (Fla. Dist. Ct. App. 2006) (contract); Young v. Ball, 835 So. 2d 385, 386 (Fla. Dist. Ct. App. 2003) (civil conspiracy).

This case presents no special reason to stray from the pack.  Indeed, Davis addressed an even starker case where family members (not simply close associates) took advantage of the plaintiff's dementia, a mental condition (beyond simple lack of knowledge).  And, unlike the situation in Hearndon, no Florida statute specifically suggests that Plaintiffs' other common-law claims are legislative priorities and should receive favored treatment.  Quite the opposite could be argued.  The fact that a statutory rule for fraud was already available in this case (had Plaintiffs been more punctual) suggests even less of a need for judicial freelancing as to other

counts.  See Brooks Tropicals, 959 So. 2d at 296 (noting it was "especially true" that fraud exception did not extend beyond fraud and fraud-in-the-inducement claims to reach fiduciary-duty claim).

As to the direct "cause" of the delay, although Plaintiffs may have lacked knowledge of their specific claims prior to filing the suit in November 2015, they acknowledge that this ignorance was principally attributable to the malfeasance of Scherban's associates (including Alexeenko) and not because SunTrust affirmatively hid information from the family in the entire period between 1996 and 2015.  See SAC, ¶¶ 81-90 (alleging, however, that "SunTrust was obligated to undertake the necessary diligence" in dealing with the family).  The Court can thus find no basis in Florida law to pull the delayed-discovery sword out of its stone to save Plaintiffs' tardy claims.

### c.  Tolling

Plaintiffs take one last stab at the timeliness issue.  They contend that equitable tolling can drag the limitations period out farther.  While the delayed-discovery doctrine postpones the accrual of claims and thus "pertains to the existence of a cause of action which then triggers the running of a statute of limitations, tolling focuses directly on limitation periods and interrupting the running thereof."  Hearndon, 767 So. 2d at 1185 (emphasis added).  The Court thus focuses on whether events after the claims accrued (January 2003) should suspend the limitations period.

Plaintiffs' only tolling argument is an equitable one, as none of the statutory bases for tolling are asserted here.  See Fla. Stat. § 95.051.  "The doctrine of equitable tolling was developed to permit under certain circumstances the filing of a lawsuit that otherwise would be barred by a limitations period."  Machules v. Dep't of Admin., 523 So. 2d 1132, 1133 (Fla. 1988).  The doctrine does not require "misconduct on the part of the defendant" but rather

focuses "on the plaintiff's blameless ignorance and the lack of prejudice to the defendant." Major League Baseball v. Morsani, 790 So. 2d 1071, 1076 n.11 (Fla. 2001); see Cocke v. Merrill Lynch & Co., 817 F.2d 1559, 1561 (11th Cir. 1987). "Generally, the tolling doctrine has been applied when the plaintiff has been misled or lulled into inaction, has in some extraordinary way been prevented from asserting his rights, or has timely asserted his rights mistakenly in the wrong forum." Machules, 523 So. 2d at 1134.

There is no such "extraordinary circumstance" here. Williams v. Albertson's Inc., 879 So. 2d 657, 659 (Fla. Dist. Ct. App. 2004). As a preliminary matter, the Court notes that tolling would not apply to the fraud count, which is the nearest miss of Plaintiffs' claims. See Hess v. Philip Morris USA, Inc., 175 So. 3d 687, 696 (Fla. 2015) ("There is no tolling provision for the fraud statute of repose."); see also CTS Corp. v. Waldburger, 134 S. Ct. 2175, 2187-88 (2014) (discussing general understanding that tolling is not available for statutes of repose). As for the other common-law claims, counting four or five years from SunTrust's wrongful keeping of the account's money in January 2003, the time to file suit would have ended in January 2007 or 2008. In other words, Plaintiffs believe that special circumstances after the cause of action accrued should allow the Court to stop the running of the limitations clock for almost eight years until November 2015, when the action commenced.

Whatever deceit Alexeenko and other Scherban associates engaged in here does not justify a nearly eight-year delay. The sons were able to reach Alexeenko by May 2003. See SAC, ¶ 82. When he met the sons' family friend, he turned over financial documents and a few SunTrust debit cards with Nikitina's and Ruslan's names on them. Id., ¶¶ 81-83. At that point, the sons knew that SunTrust had or continued to have the family's funds. Even so, Plaintiffs recount no effort by Ruslan or the estates to inquire with SunTrust for over a decade following

25

that encounter.  The Court thus assumes Alexeenko's concealment can at most justify a few months' worth of equitable tolling — from January 2003 (when the causes of action accrued) to May 2003 (when he handed over information regarding SunTrust) — in which case May 2007 or 2008 would have been the proper filing deadline.

That still leaves Plaintiffs with a sizeable request: another seven-and-a-half years of tolling.  Even more assumptions are necessary here if Plaintiffs are to have a glimmer of hope.  Hypothetically, it might have taken <u>some</u> time for Plaintiffs to get their bearings after the May 2003 meeting.  This, however, could not have taken long.  The estates had ably initiated another Florida probate action for the Boca Raton house in 1999 (a mere three years after the deaths) and opened a local SunTrust account for those real-estate proceeds in 2001.  <u>Id.</u>, ¶ 77.  In apparent pleadings discord, the Court notes some tension between Plaintiffs' assertions that the estates were able to open a Florida SunTrust account in 2001 (and close it in 2003) but that they were not able to seek information on other SunTrust accounts in the years following 2003.

In any event, the lone assumption that the estates needed a bit of time to process Alexeenko's disclosures cannot bridge this temporal gulf.  The Court could not reasonably conclude that, after May 2003, it took the estates (or Ruslan) another seven-plus years to organize their affairs and reach out to SunTrust.  Plaintiffs' only explanation for why such estate consolidation was difficult comes in a repeated refrain that, until December 2015, Ruslan "had no opportunity to come to the U.S., approach [*sic*] in person any managers at SunTrust."  <u>Id.</u>, ¶ 44.  Fatally, they never explain why a face-to-face meeting was required.  Nor do they assert that they attempted to contact SunTrust by phone or mail or that they asked any other individuals or attorneys to visit or contact a bank branch.  Considering that the size of Scherban's fortune

apparently exceeded $100 million, this protracted delay after May 2003 in seeking account information from SunTrust will not do.  Plaintiffs' period of inaction is simply too long.

The prejudice to Defendant of tolling would also be great.  Account 5216 has long been closed, and Plaintiffs allege in their Complaint that SunTrust's bank records were subject to a seven-year retention policy, meaning that all of the relevant documents could well have been discarded in 2010.  Id., ¶ 97.  Applying equitable tolling would thus contravene the fundamental purpose of statutes of limitations, which is "to relieve defendants and the courts from litigation of stale claims because evidence may have been lost or witnesses' memories faded."  Mosher v. Anderson, 817 So. 2d 812, 818 (Fla. 2002) (quoting In re Estate of Musgrove, 696 P.2d 720, 723 (Ariz. Ct. App. 1985)).  Under these circumstances, the Court cannot provide the tolling that Plaintiffs seek.

* * *

In sum, Counts I through VII and XII — conversion or confiscation, breach of contract, negligence, breach of fiduciary duty, fraud, unjust enrichment, money had and received, and constructive trust — have been brought too late.  The unauthorized-wire-transfer UCC claims are barred by a one-year repose period, and the other common-law claims are barred by various statutes of limitations or, in the case of the fraud count, by a statute of repose.  As a final adjudicatory note, even if parts of the UCC claims arise under Florida common law instead, the remaining-funds limitations analysis would also apply to bar them.  The Court now moves on to address the four remaining counts, proceeding somewhat out of numerical order.

D.  Private Right of Action (Count IX)

The Court begins with Plaintiffs' declaratory-relief claim that SunTrust violated the Banking Secrecy Act and anti-money-laundering provisions of the Patriot Act.  In general, "the

operation of the Declaratory Judgment Act is procedural only," <u>Aetna Life Ins. Co. of Hartford v. Haworth</u>, 300 U.S. 227, 240 (1937), and enlarges the range of remedies but not federal courts' jurisdiction.  See <u>Skelly Oil Co. v. Phillips Petrol. Co.</u>, 339 U.S. 667, 671 (1950).  The availability of a declaration as relief "presupposes the existence of a judicially remediable right" that falls within federal jurisdiction.  <u>Schilling v. Rogers</u>, 363 U.S. 666, 677 (1960).

The problem here is that Plaintiffs point to no such private right of action available to them under either Act.  In fact, as other courts have found, there is none.  See <u>Spitzer Mgmt., Inc. v. Interactive Brokers, LLC</u>, No. 13-2184, 2013 WL 6827945, at *2 (N.D. Ohio Dec. 20, 2013) ("The Patriot Act and the Banking Secrecy Act obligate financial institutions to monitor their accounts for suspicious activity indicative of money laundering and other criminal or terrorist activities. . . .  Neither of these statutes creates a private cause of action . . . ."); <u>see also</u> <u>AmSouth Bank v. Dale</u>, 386 F.3d 763, 777 (6th Cir. 2004) (similar for Banking Secrecy Act); <u>Wiand v. Wells Fargo Bank, N.A.</u>, 86 F. Supp. 3d 1316, 1322 (M.D. Fla. 2015) ("To the extent federal banking statutes such as the Bank Secrecy Act impose duties on banks, those duties extend to the United States, not a bank's customers.").  Seeing as Plaintiffs have not shown that these statutes are privately enforceable — indeed, they have pointed to no specific sections at all they would seek to enforce — their declaratory-relief count must be dismissed.

E.  <u>Merits (Counts VIII, X-XI)</u>

Much like a typical season finale of *Survivor*, only three remain.  Those counts are: accounting (Count VIII), fraudulent concealment (Count X), and civil conspiracy (Count XI).  These causes of action differ somewhat from their counterparts.  They focus not on lost funds, but are properly thought of as actions against SunTrust for <u>information</u> that the bank has failed to

28

disclose.  Defendant responds, often in cursory fashion, that the Complaint has not plausibly stated any of these theories.  The Court now looks at each.

### 1.  *Accounting*

In an action for an accounting, a plaintiff broadly seeks from another "a general investigation of all of the transactions between the parties."  1 Florida Jurisprudence 2d: Accounts & Accounting § 32 (2016).  "Under Florida law, a party that seeks an equitable accounting must show that: 1) the parties share a fiduciary relationship or that the questioned transactions are complex, and 2) a remedy at law is inadequate."  Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1071 (11th Cir. 2007).  Plaintiffs here essentially contend that Scherban opened numerous bank accounts at SunTrust (some unknown and with unknown sums) and ask, as relief, that the bank reveal what (if anything) is left of those accounts and who has drawn money from them.  See SAC, ¶¶ 154-58; see also id. at 38 (requesting the Court "[t]o order SunTrust to release to Plaintiffs herein all documentation associated with the above identified accounts, as well as any other accounts or assets held for the deceased or Plaintiffs in their own names or for their benefit, without limitation").

SunTrust gives little reason to doubt the viability of this count.  In its Motion, Defendant raises only one merits argument: "The relief requested (essentially a discovery request) is not cognizable as a cause of action under the law."  Mot. at 28.  This is legally mistaken, however, as Florida law recognizes a separate cause of action for an accounting.  See Cassedy v. Alland Investments Corp., 128 So. 3d 976, 979 (Fla. Dist. Ct. App. 2014) ("[A]n action for an accounting is a separate and distinct cause of action that may be available where a fiduciary duty exists.").

SunTrust waits until its Reply to put forth a second defense, albeit halfheartedly.  That brief lists the elements of an accounting action, then states snappily: "Therefore, Count VIII should be dismissed with prejudice."  Reply at 22.  As a preliminary matter, the Court does not consider whether there is another legal remedy that would entitle Plaintiffs to their bank records, as Defendant fails to point out what other claim would subsume the accounting count.  Compare Chen v. Cayman Arts, Inc., 757 F. Supp. 2d 1294, 1301-02 (S.D. Fla. 2010) (permitting claim where, "though [the plaintiff] has alleged breach of contract, he may be unable to ascertain the amount of any potential damages without an accounting"), with Kee v. Nat'l Reserve Life Ins. Co., 918 F.2d 1538, 1541 (11th Cir. 1990) ("When a judgment for breach of contract is obtainable, the remedy at law is considered adequate, precluding the need for the imposition of an equitable remedy.").

The Court can only divine from SunTrust's single explanatory parenthetical an argument that Plaintiffs have not pled the "existence of a fiduciary relationship or complex transaction." Reply at 22.  This is not so.  Trudel and Ruslan did allege that SunTrust owed fiduciary duties from Plaintiffs' various dealings with the bank, including through dealings related to the family's probate proceedings.  See SAC, ¶¶ 77-79, 133-37.  In Florida, a bank may, moreover, owe a fiduciary duty to its customers under the right set of facts.  See Bldg. Educ. Corp. v. Ocean Bank, 982 So. 2d 37, 41 (Fla. Dist. Ct. App. 2008); Capital Bank v. MVB, Inc., 644 So. 2d 515, 518 (Fla. Dist. Ct. App. 1994).

It may, of course, turn out to be the case that SunTrust owes no duty, another legal remedy is adequate, or fulfilling the accounting obligation for the Scherban family's bank balances is quite easy.  For now, SunTrust's minimalist briefing offers no specific ground to dismiss the accounting claim, and the Court declines to pull Defendant's sled for it.

2. *Fraudulent Concealment*

Beyond suing to force SunTrust to reveal details about the Scherban family accounts, Plaintiffs claim that that the bank has already improperly concealed certain information. A bit more background may be helpful here.

According to the Complaint, in November 2015, Plaintiffs sought information about the various Scherban holdings from SunTrust. See SAC, ¶ 91. Time and again, SunTrust responded that it had "reviewed the records <u>at</u> SunTrust Bank to determine if there were any accounts" and concluded that "SunTrust Bank no longer has any records in <u>its system</u>." ECF No. 38-1 (Affidavit of John A. Barry), ¶¶ 3, 8 (emphases added); <u>see</u> SAC, ¶¶ 92-93 (quoting Barry Affidavit). Apparently, these representations omitted the crucial fact that SunTrust never held on to information for closed accounts in the first place. <u>Id.</u>, ¶ 94. Old account information would thus not be "at" the bank or in "its system." SunTrust instead outsourced its archiving services first to Iron Mountain Information Management LLC and, beginning in February 2002, to Viewpointe Archives Services LLC. <u>Id.</u>, ¶¶ 95-96. Plaintiffs allege that SunTrust continually neglected to mention that it could not possibly have the documents and that they should instead contact Iron Mountain or Viewpointe to search for their account information. <u>Id.</u>, ¶¶ 97-99. This omission hence crippled Plaintiffs' protracted search for their assets. <u>Id.</u>, ¶¶ 166-74.

As an initial matter, it is unclear whether SunTrust meant the words "at" the bank and in "its system" literally or whether it implied, more broadly, that it had searched all locations that it controlled, including its contractors' files. Further, if (as Plaintiffs allege) SunTrust only needed to keep documents for seven years in the first place, <u>id.</u>, ¶ 97, it is uncertain whether SunTrust's representations would constitute meaningful misstatements. Setting aside these factual uncertainties, the Court infers from the Complaint an allegation that SunTrust or its contractors

could retain account information beyond seven years and only searched the bank's databases and not its vendors' systems.

SunTrust contends that Plaintiffs have nevertheless not successfully pled the elements of a fraudulent-concealment claim. In Florida, a plaintiff must allege that the defendant concealed or failed to disclose a material fact, it knew or should have known that fact should have been disclosed, it knew that its concealment or nondisclosure would induce the plaintiff to act, it had a duty to disclose the fact, and the plaintiff detrimentally relied on the misinformation. See Hess, 175 So. 3d at 691 (quoting Philip Morris USA, Inc. v. Hess, 95 So. 3d 254, 259 (Fla. Dist. Ct. App. 2012)); R.J. Reynolds Tobacco Co. v. Martin, 53 So. 3d 1060, 1068 (Fla. Dist. Ct. App. 2010). Defendant specifically argues that Trudel and Ruslan have failed to allege "affirmative acts by SunTrust intended to conceal information" or that they "made any request for records and w[ere] subsequently denied the request by SunTrust." Mot. at 30. In its Reply, SunTrust adds that Rule 9's pleading standard for fraud applies and again states cursorily: "None of the elements constituting fraudulent concealment are sufficiently pled in the Second Amended Complaint." Reply at 23.

None of these contentions holds water. The Court tackles SunTrust's more general observations first. Rule 9(b) requires that a plaintiff "must state with particularity the circumstances constituting fraud." This standard demands that she must describe the time, place, content, and originator of the misrepresentations, what fact was misrepresented, and the consequences of the fraud. U.S. ex rel. Williams v. Martin-Baker Aircraft Co., 389 F.3d 1251, 1256 (D.C. Cir. 2004). Trudel and Ruslan have met this high pleading hurdle. They specify that SunTrust misrepresented on six occasions relating to these court proceedings since 2015 — including one specific instance on August 4, 2016 — that it had reviewed its system's records at

the bank and found no information when in fact the bank never would have had any records. Plaintiffs thus allege that SunTrust omitted the material fact that it used Iron Mountain's and Viewpointe's archiving services.  Although Plaintiffs are slightly vaguer as to the injury, they allege that they have been on a years-long quest to untangle the estates' affairs and that SunTrust has, in effect, impeded that effort.  See SAC, ¶¶ 80-99, 171, 173.  It may be the case that these undisclosed facts about outside vendors are not ultimately material or harmful (especially given that those companies may have discarded the relevant files), but Plaintiffs have at least made enough headway in their pleadings to pass the motion-to-dismiss stage.

As to SunTrust's more specific objections that Plaintiffs have not pled affirmative acts or ever requested information, neither is persuasive.  As to the latter, Plaintiffs allege that they "propos[ed] . . . [that SunTrust] disclose to Plaintiffs the records."  Id., ¶ 167.  Florida law, moreover, does not require any affirmative misrepresentations; it is enough that a plaintiff alleges the nondisclosure of material facts.  See M/I Schottenstein Homes, Inc. v. Azam, 813 So. 2d 91, 93 (Fla. 2002) (noting Florida has extended case law around "affirmative misrepresentations to the arena of nondisclosure of material facts").  The fraudulent-concealment claim, too, may thus march forward until further discovery demonstrates otherwise.

### 3.  Civil Conspiracy

And then there was one.  In their final, civil-conspiracy claim against all Defendants, Plaintiffs contend that SunTrust, Alexeenko, Gwynfe, and Does 1 through 10 (unnamed persons, including owners of Gwynfe) participated in a scheme to steal Scherban's assets and hide those facts from the sons and estates.  See SAC, ¶¶ 175-81.  SunTrust retorts that Plaintiffs have not plausibly alleged that the bank formed an agreement with those other individuals.  Plaintiffs'

Complaint does not end on a high note here, as the Court sides with Defendant in finding that it cannot reasonably infer such agreement.

At minimum, a civil-conspiracy claim requires an agreement between two or more parties to carry out some unlawful act. Anthony, 51 So. 3d at 526 n.1. In alleging such an agreement, Rule 12(b)(6)'s threshold generally would not be satisfied by a mere contention that Alexeenko, Gwynfe, or the others simply used SunTrust as an instrumentality of their plot. See Freyre v. Hillsborough Cty. Sheriff's Office, No. 13-2873, 2014 WL 2112043, at *7 (M.D. Fla. May 14, 2014) ("A decision reached by [an individual] based on the information presented to her by other individuals does not plausibly constitute a conspiracy."). "Without more, parallel conduct [also] does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." Twombly, 550 U.S. at 556-57 (in context of Sherman Act); accord Alhassid v. Bank of Am., N.A., 60 F. Supp. 3d 1302, 1319 (S.D. Fla. 2014) (for Florida civil-conspiracy claim). Instead, "[a] cause of action for civil conspiracy should allege the scope of the conspiracy, its participants, and when the agreement was entered into." In re Chiquita Brands Int'l, Inc. Alien Tort Statute & Shareholder Derivative Litig., 690 F. Supp. 2d 1296, 1311 (S.D. Fla. 2010).

Plaintiffs nowhere even allege that SunTrust reached some agreement with the other parties. See Alhassid, 60 F. Supp. 3d at 1319 ("Because [plaintiff] never alleged that there was an agreement, it has failed to allege sufficient facts with respect to the conspiracy count.") (quoting Russo v. Fink, 87 So. 3d 815, 819 (Fla. Dist. Ct. App. 2012)). Trudel and Ruslan recount that Alexeenko concealed account information from them and then SunTrust separately hid information, but Plaintiffs state no facts as to how those events were coordinated or why they would be related. See SAC, ¶¶ 176, 178-79. And although Gwynfe and Alexeenko may have

used SunTrust's services as a means to pocket Scherban's assets, Plaintiffs do not suggest that the bank was in on the scheme.  Id., ¶ 177; see Serdiouk Affidavit, ¶ 11 (alleging that Alexeenko asked another associate to confirm a wire transfer with SunTrust telephonically).

The closest Trudel and Ruslan get to alleging conspiracy is that SunTrust "failed to cooperate in arrangements for a deposition of Alexeenko, as though such evidence would be undesirable for SunTrust."  SAC, ¶ 179.  Yet a simple litigation position that benefits another does not a conspiracy make.  See Regions Bank v. KEL Title Ins. Grp., Inc., No. 12-118, 2012 WL 5381510, at *2, 4 (N.D. Fla. Nov. 1, 2012) (finding provision of legal services would not create plausible inference of conspiracy).  Nor do Plaintiffs suggest why SunTrust's cooperation would be necessary to subpoena Alexeenko for a deposition or that the bank somehow directed him not to appear at any scheduled deposition.

As Plaintiffs have not raised a reasonable inference that SunTrust entered into any agreement with the other purported conspirators, the Court will dismiss SunTrust from this count.

* * *

All told, after the edges of the Complaint are smoothed out, Plaintiffs have plausibly supported legal theories for accounting (Count VIII) and fraudulent concealment (Count X). These counts essentially raise the issue that SunTrust has not yet revealed the full extent of relevant account information (or that a factual question exists as to whether the bank has done so), an issue that is wholly and uniquely within the bank's power to head off.  As to all other counts, the Court will dismiss SunTrust as a Defendant.

**IV.    Conclusion**

For these reasons, the Court will grant in part and deny in part Defendant's Motion to

Dismiss.  A separate Order so stating will issue this day.

                                        /s/ *James E. Boasberg*
                                        JAMES E. BOASBERG
                                        United States District Judge

Date:  <u>December 12, 2016</u>